ENDORSED
First Judicial District Court

JUL 1 4 2008

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO, *ex rel.* FRANK C. FOY
AND SUZANNE B. FOY,

    *Qui tam* Plaintiffs,

v.

No. D-101.CV-2008-01895

VANDERBILT CAPITAL ADVISORS, LLC;
VANDERBILT FINANCIAL, LLC;
VANDERBILT FINANCIAL TRUST;
OSBERT M. HOOD; RON D. KESSINGER;
ROBERT P. NAULT; JAMES R. STERN;
PATRICK A. LIVNEY; STEPHEN C. BERNHARDT;
KURT W. FLORIAN, JR.; ANTHONY J. KOENIG, JR.;
MARK E. BRADLEY; PIONEER INVESTMENT
MANAGEMENT U.S.A., INC.;
PIONEER GLOBAL ASSET MANAGEMENT S.P.A.;
UNICREDITO ITALIANO, S.P.A.;
KATTEN MUCHIN ROSENMAN LLP;
RICHARDS, LAYTON & FINGER, P.A.;
CLIFFORD CHANCE US, LLP; ERNST & YOUNG LLP;
PRICE WATERHOUSE COOPERS; BRUCE MALOTT;
MEYNERS + CO; GARY BLAND; CITIGROUP;
CITIGROUP GLOBAL MARKETS INC.;
BEAR, STEARNS & CO. INC.; UBS INVESTMENT BANK;
UBS SECURITIES LLC ; CALYON CREDIT AGRICOLE CIB;
CREDIT AGRICOLE SA; JEFFERIES CAPITAL MANAGEMENT, INC.;
FORTIS SECURITIES LLC; FORTIS NV; ACA MANAGMENT, L.L.C.;
J.P. MORGAN CHASE BANK, N.A.; ABN AMRO, INC.;
STONE CASTLE SECURITIES, L.L.C.,; AND JOHN DOE #1;
JOHN DOE #2; and JOHN DOE #3 THROUGH #50,

    Defendants.

## COMPLAINT UNDER THE FRAUD AGAINST TAXPAYERS ACT

EXHIBIT A

## I. INTRODUCTION

1. This is an action to recover damages for the State of New Mexico under the Fraud Against Taxpayers Act, NMSA 1978, § 44-9-1 through -14. The *qui tam* plaintiffs and relators are Frank C. Foy and Suzanne B. Foy. They are citizens and taxpayers of New Mexico. This action seeks to recover three times the amount of damages sustained by the State of New Mexico because of the violations of the Fraud Against Taxpayers Act, along with civil penalties, costs, and reasonable attorney fees, including the fees of the Attorney General, all as provided in § 44-9-3(C), plus pre- and post-judgment interest. In total, the amounts recoverable are in excess of $300 million.

2. As a result of defendants' violations of the Fraud Against Taxpayers Act, the State of New Mexico lost $90 million: $40 million from the Educational Retirement Board and $50 million from the State Investment Council. The Educational Retirement Board ("ERB") provides retirement benefits to public school teachers in New Mexico, and college professors, and employees of public schools and colleges. As of June 30, 2007, the ERB had 122,598 members, of whom 62,697 were active members, and 29,969 were retirees or beneficiaries. The State Investment Council ("SIC") invests the State's permanent funds for the benefit of public schools and colleges, and for the operations of the state. The ERB and the SIC lost substantially all of the $90 million they invested in CDO-related products offered by Vanderbilt Capital, Citigroup, Bear Stearns, UBS, Calyon, and others. The proceeds from this action should be returned to the ERB and the SIC in accordance with § 44-9-7(D) and (E).

3.  The defendants knowingly presented, or caused to be presented, to the State a false or fraudulent claim for payment or approval, in violation of § 44-9-3(A)(1).

4.  The defendants knowingly made or used, or caused to be made or used, a false and misleading or fraudulent record or statement to obtain or support the approval of the payment on a false or fraudulent claim, in violation of § 44-9-3(A)(2).

5.  The defendants conspired to defraud the state by obtaining approval or payment on a false or fraudulent claim, in violation of section § 44-9-3(A)(3).

6.  The defendants conspired to make, use or cause to be made or used, a false, misleading or fraudulent record restatement to conceal, avoid or decrease an obligation to pay out or transmit money or property to the State, in violation of § 44-9-3(A)(4).

7.  When in possession, custody or control of property or money to be used by the State, the defendants knowingly delivered or caused to be delivered less property or money than the amount indicated on a certificate or receipt, in violation of § 44-9-3(A)(5).

8.  When authorized to make or deliver a document certifying receipt of property used by the State, the defendants knowingly made or delivered a receipt that falsely represented a material characteristic of the property, in violation of § 49-9-3(A)(6).

9.  The defendants knowingly made or used, or caused to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State, in violation of § 44-9-3(A)(8).

10. As beneficiaries of an inadvertent submission of the false claim and having subsequently discovered the falsity of the claim, the defendants failed to disclose a false claim to the State within a reasonable time after discovery, in violation of § 44-9-3(A)(9).

11. As used in this complaint, "claim" means a request or demand for money, property or services when all or a portion of the money, property or services requested or demanded issues from or is provided or reimbursed by the State. In this case all or some of the money issued from the State of New Mexico, or was provided or reimbursed by it.

12. As used in this complaint, "knowingly" (or related words like "knew" or "knowledge") has the meaning provided in § 44-9-2(C): that a person, with respect to information, acted: (1) with actual knowledge of the truth or falsity of the information; (2) in deliberate ignorance of the truth or falsity of the information; or (3) in reckless disregard of the truth or falsity of the information.

13. As used in this complaint, "CDO" or "CDO-related" refers to collateralized debt obligations and related products, including ABS (asset-backed securities), CLO (collateralized loan obligations), synthetic CDOs, and including all tranches or levels thereof, from the most senior to the most junior, including the so-called "equity tranche," and including such features as leverage (borrowing), repurchase agreements, total return swaps, credit default swaps, warehouse facilities, and hedging and interest rate strategies, and related services.

## II. PARTIES

14. The plaintiffs are the State of New Mexico, *ex rel.* Frank C. Foy and Suzanne B. Foy. The real party plaintiffs in interest are the State of New Mexico and state educational institutions and educational employees or retirees covered by the Educational Retirement Board and/or the State Investment Council.

15. Vanderbilt Financial Trust (the "Trust") is a Delaware Statutory Trust organized by Vanderbilt Capital Advisors, LLC ("Vanderbilt Capital"), to own substantially all of the common membership interests of Vanderbilt Financial, LLC ("Vanderbilt Financial").

16. Patrick A. Livney is the Chief Executive Officer and a director of Vanderbilt Financial, and Senior Managing Partner of the Structured Finance Group of Vanderbilt Capital.

17. Osbert M. Hood is a director of Vanderbilt Financial, and the President and Chief Executive Officer and a director of Pioneer Investment Management USA; and a Director of Pioneer Global Asset Management S.P.A. (the Italian parent company of Pioneer).

18. Stephen C. Bernhardt is Chief Investment Officer of Vanderbilt Financial and Senior Portfolio Manager of the Structured Finance Group of Vanderbilt Capital.

19. Ron D. Kessinger, Robert P. Nault, and James R. Stern are independent directors of Vanderbilt Financial.

20. Kurt W. Florian, Jr. is the Chief Operating Officer and Counsel of Vanderbilt Financial, and the Chief Operating Officer and Counsel of the Structured Finance Group of Vanderbilt Capital.

21. Anthony J. Koenig Jr is the Interim Chief Financial Officer of Vanderbilt Financial.

22. Mark E. Bradley is the Interim Chief Accounting Officer of Vanderbilt Financial.

23. Pioneer Investment Management U.S.A., Inc is the parent of Vanderbilt Financial and Vanderbilt Capital.

24. Pioneer Global Asset Management S.P.A. is the immediate parent of Pioneer Investment Management U.S.A.

25. Unicredito Italiano, S.P.A. is the parent of Pioneer Investment and Pioneer Global Asset Management.

26. Katten Muchin Rosenman LLP; Richards, Layton & Finger, P.A.; Clifford Chance U.S. LLP are law firms that acted on behalf of the Vanderbilt defendants.

27. Ernst & Young LLP; and Price Waterhouse Coopers are accountants who acted on behalf of the Vanderbilt defendants.

28. Citigroup and Citigroup Global Markets Inc. are entities that provided banking, investment banking, and other services and products.

29. UBS Investment Bank and UBS Securities LLC are entities that provided banking, investment banking, and other services and products. These entities are subsidiaries or affiliates of UBS AG, formerly known as Union Bank of Switzerland. UBS AG also provided banking, investment banking, and other services and products.

30. Bear, Stearns & Co. Inc. is an entity that provided investment banking and other services and products.

31. Citigroup and Citigroup Global Markets Inc. acted as "Joint Book-Running Managers" on the investment, along with Bear, Stearns & Co. Inc. UBS acted as Co-Manager. All of them acted as initial purchasers/placement agents.

32. Bruce Malott is a Certified Public Accountant who lives and works in New Mexico. He is the Managing Principal of Meyners + Co., a public accounting firm with its principal place of business in Albuquerque, New Mexico. Meyners + Co. is a member of the BDO Seidman Alliance.

33. Gary Bland is the State Investment Officer. He acts as the chief staff executive of the State Investment Council.

34. Calyon, also known as Calyon Credit Agricole CIB, is a subsidiary of Credit Agricole SA. Calyon and/or Credit Agricole provided banking, investment banking, and other services and products.

35. Defendants John Does are additional individuals or entities who have participated and conspired with the defendants to perform the unlawful acts or omissions alleged herein, but their identities and actions are unknown or inadequately known at this time. These defendants are referred to in the masculine, although they may be feminine or artificial persons. Discovery in this case will provide information about these unidentified defendants, so that they can then be identified as named defendants.

36. ACA Management, L.L.C. is a wholly-owned subsidiary of ACA Risk Solutions, L.L.C. ("Risk Solutions") and Risk Solutions is wholly-owned by ACA Service L.L.C. ("ACA Services"), the holding company for the structured finance businesses of ACA Capital Holdings, Inc. ("ACA Capital Holdings"). ACA Services is wholly-owned by ACA Financial Guaranty Corporation ("ACA Guaranty"), and ACA Guaranty is wholly-owned by ACA Holding, L.L.C., a wholly-owned subsidiary of ACA Capital Holdings, Inc.

37. JPMorgan Chase Bank, National Association is a national bank or bank holding company. It provided banking and investment banking and other services and products.

38. ABN AMRO Incorporated is a subsidiary or affiliate of Fortis NV, which is a Belgian holding company. Fortis Securities, L.L.C. is also a subsidiary or affiliate of Fortis NV. These entities provided investment banking, banking and other services and products.

39. StoneCastle Securities L.L.C. is a subsidiary or affiliate of StoneCastle Partners LLC. These entities provided investment and investment banking services.

40. John Doe #2 is a citizen of New Mexico. His name and identity are set forth in sealed Exhibit A, which is attached and incorporated as part of this complaint. This exhibit is not to be unsealed without the written permission of the *qui tam* plaintiffs.

41. Most of the defendants are out-of-state entities which have not appointed registered agents in the State of New Mexico.

42. Some of the defendants are subsidiaries or affiliates of other defendants, or are effectively controlled by, or are under common control or ownership with other defendants. The purported distinctions between these entities should be disregarded for purposes of this case, for the following reasons: The subordinate or affiliate entities acted as the mere alter ego or instrumentality of the superior or controlling entity. The subordinate or affiliate entities were mere shells, without actual independent management or governance of their own. The subordinate or affiliate entities were used by the other defendants for their own purposes, not the purposes of the subordinate or affiliate entities. The subordinate or affiliate entities were not adequately capitalized, did not hold proper meetings, did not

establish proper management structures and committees, did not maintain proper records, and did not act through the entity's own officers, employees, and directors. The subordinate or affiliate entities did not act as independent and separate entities. The superior or controlling entities disregarded the separate existence and purpose of the subordinate or affiliate entities. The management and employees of the superior or controlling entities participated in, directed, ordered, approved, or ratified the wrongful conduct of the subordinate or affiliate entities, and of the other defendants.

43. All of the defendants have transacted or presently transact and conduct business within New Mexico. All of the defendants have committed wrongful and tortious acts within New Mexico. All of the defendants benefitted from and were unjustly enriched by the false claims made by other defendants and co-conspirators.

44. All of the foreign defendants named above participated in offering CDO products in which the ERB and SIC invested.

45. All of the defendants are jointly and severally liable for any act in violation of the Fraud Against Taxpayers Act committed by other defendants, or other persons not yet named as defendants, as provided in § 44-9-13.

III. FALSE AND MISLEADING CLAIMS BY THE DEFENDANTS

46. In order to obtain $90 million from the State of New Mexico for investment in CDO-related securities issued by Vanderbilt, the defendants made, or caused to be made, numerous false and misleading or fraudulent statements about the investment, including but not limited to:

- 1. That the investment would have a high level of risk adjusted earnings;

- 2. That the interests of Vanderbilt and the other defendants were closely aligned with the interests of the ERB and SIC as equity investors;

- 3. That they had eliminated any conflicts of interests between their interests and the interests of the ERB and the SIC as investors;

- 4. That the CDOs were backed by high quality residential mortgages;

- 5. That Vanderbilt would throw out problem mortgages before they bought them from the CDO originators, so that Vanderbilt would invest in the very best quality loans;

- 6. That the value of the shares was demonstrated by the fact that Vanderbilt, Citigroup, Bear Sterns and UBS were buying shares along with the ERB and SIC;

- 7. That the investment provided strong collateral performance, attractive spreads, experienced collateral managers, consistent returns, and improved liability and transparency in a variety of market and economic conditions;

- 8. That the defendants had the expertise and proprietary methods to understand and control and minimize the risks of the investment;

- 9. That the shares in Vanderbilt Financial would be listed on European exchanges within 2 weeks after the State bought them, so that the State would have the ability to sell the shares sooner than had been expected;

- 10. That Vanderbilt would register the shares with the SEC within 190 days so that the State would be able to resell the shares;

- 11. That Vanderbilt had special computer programs and expertise to spot problem mortgages before they became a problem;

– 12. That the investment is protected by regular on-site due diligence of ABS issuers and servicers and of the issuers origination channels;

– 13. That the CDOs will be protected by numerous criteria for credit quality, and that Vanderbilt's ability to source opportunities distinguishes it from its competitors;

– 14. That the investment would use only high quality CDO managers;

– 15. That the investment was designed to minimize defaults;

– 16. That the risks were adequately covered by insurance or credit swaps or hedges with solid insurers or counterparties;

– 17. That Citigroup and Bear Stearns would waive their fees and commissions on this investment;

– 18. That other outside investors would also be investing in these securities;

– 19. That the investment is protected by a proprietary collateral enhancement risk database;

– 20. That the investment is protected by an understanding of the underlying collateral;

– 21. That each CDO portfolio will be constructed with strict sector and diversification parameters and rigorous credit processes, focusing on principal preservation;

– 22. That the information about the investment had been obtained from independent sources;

– 23. That the expectations and projections for the investment were based on reasonable assumptions;

– 24.   That the promoters of the investment had special core competencies and resources and skill and expertise;

– 25.   That the investment would implement a business strategy differentiated from others;

– 26.   That the investment in Vanderbilt was protected by appropriate safeguards;

– 27.   That the investment was based on diversification;

– 28.   That the investment was based on rigorous analysis of credit and credit fundamentals;

– 29.   That Vanderbilt was backed by Pioneer and Unicredito, its parent companies;

– 30.   That Vanderbilt was a research driven firm;

– 31.   That the investment was based on an ability to identify opportunities;

– 32.   That the investment would benefit from a large and diverse group of investment banks and mortgage loan originators;

– 33.   That the managers had a depth of experience with the targeted asset classes;

– 34.   That the investment would be managed by a board of directors with an independent majority;

– 35.   That the directors would owe fiduciary duties to the equity investors;

– 36.   That the directors would fulfill their fiduciary duties;

– 37.   That the directors will supervise the activities of the investment;

– 38.   That the directors will establish an audit committee, compensation committee, and a nominating and corporate governance committee;

– 39.   That the directors will implement and carry out a code of ethics;

– 40.  That the State could rely on the diligence and skill of the managers and servicers selected by Vanderbilt Capital;

– 41.  That the investment would benefit from special steps taken to minimize the potential for misrepresentation of loan quality or terms by the loan originators, or misrepresentation of the nature and quality of the assets;

– 42.  That the investment vehicle was bankruptcy remote;

– 43.  That the investment will maximize for the State the spread between cost of borrowing, and the return on the underlying investments;

– 44.  That the defendants understood how these investments would behave under all market conditions, due to their sophisticated computer modeling techniques;

– 45.  That the investment is protected by the independent directors, and a compliance department, and Vanderbilt's conflict resolution system;

– 46.  That the managers and servicers would provide adequate credit review and scrutiny to the underlying portfolio of mortgages, loans, and other investments;

– 47.  That the value of the CDOs and the underlying loans and assets was substantially greater than it actually was;

– 48.  That the Vanderbilt investment would yield a return of 20% per annum, and perhaps more.

47.  These claims, statements, and representations were false and misleading.

48.  In reality, the Vanderbilt investment was not backed by high-quality underlying assets that had been carefully analyzed and screened by the defendants, and defendants knew this.