49.     Defendants had a mutual agreement, or understanding, or course of conduct to tout the other defendants' CDO products and jointly promote each others' products and include them in their own CDOs and portfolios. The defendants jointly acted to conceal the falsity of their claims about the products they jointly promoted, as they all profited from the sale of these unsound products. The defendants jointly acted to inflate the prices of these products.

50.     All of the financial defendants made false claims about their products as described above.

51.     Although the defendants falsely claimed that their interests were closely aligned with the interests of the State, in reality the defendants' interests were not aligned with the State's. The defendants had a strong interest in unloading these overvalued securities on the ERB and SIC. The defendants concealed and failed to disclose the conflicts between their interests and the State's interest as an investor.

52.     Through their false claims and representations, the defendants sold the State of New Mexico a worthless combination of liars' loans, lethal leverage, and toxic waste.

53.     "Toxic waste," as the term is used in the CDO trade, refers to the first loss position or equity tranche in a CDO. The holder of toxic waste suffers the first loss, because the equity tranche receives funds only after all of the senior tranches have been paid in full. It is called toxic waste because it is the riskiest position, and because it is the residue left over after investment banks assemble and securitize a CDO. Toxic waste is a byproduct of the lucrative process whereby the defendants and others in the CDO business assemble assets and securitize them, taking large fees and commissions in the process. The

defendants wanted to rid themselves of this toxic waste, and they made false and misleading statements in order to peddle it to the ERB and SIC. The Vanderbilt toxic waste was worthless, but the defendants managed to sell it to the State of New Mexico for $90 million, thereby enriching themselves at the expense of the State and ridding themselves of toxic risks associated with this first loss tranche. In order to accomplish this, the defendants told the State of New Mexico that it would be protected by the fact that the defendants would also invest in the equity tranche, while concealing the fact that their investments in this equity tranche is far outweighed by the revenue they made from selling most of nonexistent "equity" to the State. In fact, there was no "equity" in the Vanderbilt shares; these securities were virtually worthless from the beginning.

54. "Liars' loans," as the term is used in the CDO trade, refers to loans, usually residential mortgage loans, made to borrowers who provide little or no documentation or verification of the statements they made on their loan applications, including their income, assets, ability to repay, and whether they are actually residing in the home as their primary residence, or acquiring their second or third property, or a speculative investment. The defendants represented that they carefully screened the loan applications to weed out liars, but in fact they knew that many of these borrowers were making false statements on their applications, and did not have the ability to repay the loans. Indeed, the defendants or their loan originators actively encouraged and solicited persons to borrow money based on false representations, because the defendants made huge profits from packaging the loans, while passing the underlying risk of default on to the CDO investors.

55.    "Exception loans," as the term is used in the CDO trade, refers to loans that do not even meet the minimal documentation requirements or lending standards set by the loan originator or lender.  The defendants knew that many of the underlying CDO assets were exception loans, but they misrepresented and concealed this fact.  The defendants made huge sums from packaging and securitizing these exception loans while passing the risks on to the CDO investors, like the State of New Mexico.

56.    The defects in the Vanderbilt CDO product were compounded by leverage.  The defendants made repeated misrepresentations about the amounts of leverage in this investment, and the increased risks created by leverage.  They falsely stated that they had the special expertise and ability to control the adverse effects of leverage.  In reality, these securities were designed in such a way that they were destined to fail if there were any adverse movements in interest rates on the borrowings which had to be paid before the ERB and SIC received anything on their investment.

57.    The defendants also misrepresented and concealed the nature of the underlying mortgages.  Many of them were adjustable rate mortgages that forced the borrowers to pay much higher interest rates after a short introductory period.  The defendants knew that many of these borrowers would not be able to meet their mortgages after the interest rates reset, but they falsely stated otherwise in order to induce the State to invest.

58.    Without these false claims, statements, and representations, the State of New Mexico would not have made this investment.

59.    Because they occupied the first loss position, the ERB and the SIC were especially dependent on having high-quality underlying assets with low default rates. The ERB and the SIC were especially vulnerable to liars' loans, exception loans, and lethal leverage, and losses on credit default swaps, counterparty risk, and mistaken hedging strategies. Holders of the more senior position could still be paid in full if the CDOs did not perform as well as expected, because they had a greater cushion if the assets and strategies were as good as the defendants represented.

60.    Vanderbilt Capital breached its management agreement with Vanderbilt Financial. Vanderbilt Capital acted in bad faith or in reckless disregard toward the State of New Mexico. It committed wilful misconduct. It acted with gross negligence.

IV.    FRANK FOY AND HIS FIGHT AGAINST KICKBACKS AND ILLEGAL INDUCEMENTS.

61.    The *qui tam* plaintiff Frank Foy joined the ERB in 1992 as the Manager of the Fixed Income Portfolio, after working more than 20 years in banking and investment in the private sector in New Mexico. In 1996 he became the ERB's Chief Investment Officer, and continued in that position until the events stated below. As Chief Investment Officer, he had overall responsibility for all of ERB's investments.

62.    As Chief Investment Officer, Frank Foy instituted a strict policy against political contributions by persons doing business with the ERB. This policy was necessary to fulfill strict fiduciary duties which the ERB owed to educational retirees. This policy against political contributions was also necessary to ensure that the ERB awarded contracts for investment services to the best, most competent, and most honest contractors, not the ones who paid people in power. Further, the policy was necessary so that New Mexico

17

could attract the most competent investment advisors, because a reputation for "pay to play" discourages the honest advisers from competing vigorously for the State's business, since they believe that the business will be awarded to less qualified advisors who are willing to provide illegal or improper inducements and kickbacks in order to obtain the State's business.

63.     Beginning in 2003, the ERB was pressured to award contracts and make investments with persons or entities based upon political considerations.  These pressures were exerted by Bruce Malott on instructions from John Doe #2 (and perhaps others).  This was a plain violation of the fiduciary duties owed by the ERB to its members.

64.     Similar pressures were exerted on the SIC.  Gary Bland and others at the SIC carried out instructions from John Doe #2 (and perhaps others) to invest State money in exchange for political contributions or other illegal or improper inducements.  This was a plain violation of the fiduciary duties of board members and staff at the SIC.

65.     Until 2003, the ERB Board had a majority of directors who took their fiduciary duties seriously, and acted in the best interests of the educational retirees who depend on the ERB for their retirement benefits.  After 2003, the situation began to change, and the Board came to be controlled by persons who were willing to make investments and award contracts for political or other improper reasons, following the lead of Bruce Malott and the instructions of John Doe # 2 and perhaps others.

66.     In 2005 Bruce Malott told Frank Foy that John Doe # 2 said that Foy could keep his job at the ERB, but warned that Foy had better become a "team player," meaning

that Foy needed to cooperate with awarding business as directed by Malott and John Doe #2.

67.     By 2006, it had become apparent to Frank Foy and the professional staff of ERB that in some instances the decisions of the ERB and the SIC and the State Board of Finance were being tainted by political considerations and contributions. Frank Foy was particularly outspoken in his attempts to prevent this from happening. He insisted on enforcing the ERB prohibition on political contributions by vendors and advisors.

68.     As a result, Bruce Malott and John Doe # 2 and perhaps others wanted to get rid of Mr. Foy, and they looked for excuses and opportunities to do so. As Chief Investment Officer, Mr. Foy was an exempt employee who could be terminated without cause, and without civil service protections. Because it was clear that he was being targeted for elimination, Mr. Foy was forced to protect himself by taking a demotion to Deputy Chief Investment Officer, a classified position. He arranged this with the ERB's Executive Director, Evalynne Hunemuller.

69.     In early 2006 Patrick Livney of Vanderbilt began to call Frank Foy, and Bruce Malott began to pressure Mr. Foy and the ERB staff to buy CDO products from Vanderbilt. The Vanderbilt CDO product was not a good investment, and it did not fit in ERB's portfolio, so Frank Foy vigorously resisted the idea. Other ERB staff and advisers also concluded that it was not a good idea, and recommended against the investment. However, Bruce Malott absolutely insisted that the ERB invest in this particular product from this particular vendor. In May 2006 the Board voted 4-2 to invest in Vanderbilt. The directors selected by public school teachers voted against the investment. The directors who voted for

the investment were swayed by improper considerations. They voted for the Vanderbilt investment on instructions from Malott and/or John Doe #2 (and perhaps others).

70.     There were other instances in which Bruce Malott and others pressured the ERB to hire investment managers who were not the best qualified candidates, or to make investments. Frank Foy and other staff members resisted these actions, but Malott had enough votes on the ERB board to push them through.

71.     Malott's actions were intended to gain business and political favor for himself and Meyners, as part of Meyners' efforts to develop its accounting business. Malott's actions were a deliberate breach of the strict fiduciary duties which he owed to the ERB and ERB retirees. Malott's actions were not within the scope of his duties as an ERB board member; those duties do not include raising political contributions and developing business for his CPA firm.

72.     In December 2006 Bruce Malott spoke with Evalynne Hunnemuller, the ERB's Executive Director.   Malott demanded that she submit her resignation before the next day's board meeting, or she would be fired. As grounds for firing her, Malott offered the pretext that she had organized a Board retreat without consulting him about the agenda. This pretext was false.  After Ms. Hunemuller submitted her resignation, Malott told her the real reason he had fired her was because she would not fire Frank Foy.  Malott had become irate when he had found out that Foy had been reclassified to a protected position, where firing him would be difficult.

73.     Frank Foy continued as Deputy Investment Officer during 2007, and continued to speak out against "pay to play."

74.     In April 2007, Mr. Foy reviewed the federal campaign contribution report filed by the Richardson for President campaign.  The report showed a contribution of $2,300, the maximum amount allowed by law, from Patrick A. Livney, 365 Elder Lane, Winnekta, IL 60093, on February 15, 2007.  It also showed a contribution of $2,300 on the same day from Stephanie R. Livney, at the same address.  Mr. Foy called Mr. Livney to verify these contributions.  This confirmed Mr. Foy's earlier belief that the pressure to invest in Vanderbilt was motivated by illegal and improper inducements – kickbacks or bribes in the form of campaign contributions in exchange for the $90 million obtained from the State of New Mexico.

75.     On numerous occasions after the State invested in Vanderbilt, the defendants knowingly made false statements about the investment and the underlying assets and liabilities.  These false statements were designed to conceal and misrepresent the fact that the State's investment was virtually worthless, and the fact that the value of the CDOs was grossly overstated, and the fact that many of the mortgage borrowers were in default on their loans.

76.     In August 2007, Vanderbilt issued a financial report to investors on the second quarter of 2007.  The report included the following statements:  "The performance of the CDOs owned by Vanderbilt Financial has been good from a cash flow point of view . . . ."  "Vanderbilt Financial's CLOs are likely to continue their positive performance . . . ."  "[W]e expect to build cash at Vanderbilt Financial, and will reinstate dividend payments as soon as our cash levels and outlook for future cash flows are at levels that allow us to pay

dividends." "Our return on equity continues to exceed previous expectations." These statements were false and misleading, and known to be false and misleading.

77.     In December 2007, Vanderbilt issued audited financial statements for the period since inception to December 31, 2006. These financial statements were audited and certified by PriceWaterhouseCoopers. These financial reports stated that Vanderbilt Financial had assets of $ 6, 265,419,000 and liabilities of $6,109,452,000, for a net worth or net equity of $140,281,000. These statements were false and misleading, and known to be false. In reality, Vanderbilt Financial's net worth was zero or almost zero.

78.     In December 2007, Frank Foy was falsely accused of "sexual harassment" and "hostile work environment." These accusations were plainly pretextual and clearly contrived to force Mr. Foy to retire. He was demoted from Deputy Investment Officer to Portfolio Manager. He was ordered to move his office from Albuquerque, a few minutes from his home, to Santa Fe, so that he was forced to commute hours each day without being reimbursed for mileage. In Santa Fe he was given very little to do, and no office. In March 2008, Mr. Foy was instructed that he could no longer attend meetings of the ERB Board or the ERB Investment Committee. Ultimately these retaliatory actions forced Mr. Foy to retire.

79.     All these actions were taken because Mr. Foy stood as an obstacle to "pay to play." Malott and others retaliated against Mr. Foy because he had vigorously resisted the investment in Vanderbilt, as well as other investments that were based on improper and illegal considerations, such as bribes, kickbacks, and other illegal inducements.

22

80.     Often these illegal inducements were disguised as political or charitable contributions.  In most instances, the defendants were careful to conceal their real intentions and agreements, so as to maintain deniability if the "contributions" were challenged.  Underneath the concealments and denials, there was an agreement or understanding, either express or tacit, that the SIC and ERB would invest in the Vanderbilt CDO in exchange for political contributions by Vanderbilt.

81.     But for these illegal inducements, the investments in Vanderbilt would not have been made.

82.     Mr. and Mrs. Foy reserve their rights to bring an action under § 44-9-11 and other applicable laws to redress these injuries which they have personally suffered, either in this lawsuit or in a separate action.  However, they bring this lawsuit at present only on behalf of the State of New Mexico, and only to redress the present injuries suffered by the State and by the public school and college employees who depend on the State for their retirement income.

## V.     DAMAGES SUFFERED BY THE STATE OF NEW MEXICO.

83.     The Vanderbilt investment was virtually worthless.  Except for two dividends It generated no other income, and the entire principal amount was lost.  The State of New Mexico lost its entire investment of $90,000,000.  In addition, the State lost the income it could have earned if the false claims and representations had been true, or that money had been invested elsewhere.

84.     On August 8, 2006, the State wired $ 90,000,005 to Vanderbilt.  In December 2006 the State received a dividend of $ 1,800,000.10, and a dividend of $ 1,920,000.44 in

May 2007.  Vanderbilt has informed the ERB and the SIC not to expect any more from its investment.

85.   As of August 8, 2008, the State of New Mexico has suffered actual damages as follows:

| | |
|---|---|
| Loss of investment principal | $ 90,000,000 |
| Loss of investment income (calculated at 20% per annum, less dividends received, compounded quarterly) | $ 31,791,480 |
| Total | $121,791,480 |

86.   The foregoing amount is trebled pursuant to § 44-9-3(C)(1), so the damages recoverable as of August 2008 are in excess of $365,000,000, exclusive of penalties, costs, and attorneys' fees.

## VI.   CLAIM UNDER UNFAIR TRADE PRACTICES ACT.

87.   In addition to violating the Fraud Against Taxpayers Act, by the acts and omissions set forth in this complaint, the defendants have also violated the Unfair Trade Practices Act, §§ 57-12-1 *et seq.*, including but not limited to:  §§ 57-12-3; 57-12-2(D)(1), (2), (3), (5), (7), (12), (14), (15), (16), (17); and 57-12-2(E).

## PRAYER FOR RELIEF

88.   WHEREFORE, the State of New Mexico, *ex rel.* Frank C. Foy and Suzanne B. Foy, prays for:

A.   An award of actual damages in the amount of $ 90,000,000 in lost principal;

B.   Actual damages for lost income;

C.     Pre- and post-judgment interest under §§ 56-8-4 and 56-8-3, and as otherwise provided by law;

D.     Trebling of the foregoing amounts as provided in § 44-9-3(C)(1).

E.     A civil penalty of not less than five thousand dollars ($ 5,000) and not more than ten thousand dollars ($ 10,000) for each violation;

F.     The costs of this civil action;

G.     Reasonable attorney fees, including the fees of the attorney general and counsel for the *qui tam* plaintiffs;

H.     Awards distributing the proceeds of this action or any related settlement in accordance with § 44-9-7;

I.     Judgment that each of the defendants is jointly and severally liable to the State of New Mexico;

J.     Equitable, declaratory, and injunctive decrees requiring the ERB and the SIC to implement and enforce policies against political contributions, direct or indirect, by any person doing business with the ERB or the SIC;

K.     Damages and other relief under the Unfair Trade Practices Act, §§ 57-12-1 *et seq.*; and

L.     Such other and further relief as may be necessary or appropriate.

### JURY DEMAND

Pursuant to Rule 1-038, NMRA 2008, plaintiffs hereby demand a trial by a twelve (12) member jury in the above entitled cause.

Respectfully submitted,

VICTOR R. MARSHALL & ASSOCIATES, P.C.

By_____
    Victor R. Marshall
    Attorneys for *Qui tam* Plaintiffs
    12509 Oakland NE
    Albuquerque, New Mexico
    505/332-9400
    505/332-3793 FAX

26